348 P.2d 734

**CONSOLIDATED TUNGSTEN MINES, INC., an Arizona corporation, Appellant,**

**v.**

**H. FRAZIER, George W. Denton, Lon A. Fuller, Clint Camp and J. M. Cobb, Appellees.**

**No. 6472.**

Supreme Court of Arizona.

Jan. 20, 1960.

Rehearing Denied Feb. 24, 1960.

Palmer C. Byrne, Prescott, for appellant.

Edward B. Ashurst, Wickenburg, for appellees.

PHELPS, Justice.

This is an appeal from a judgment in favor of defendants and against plaintiff in an action instituted by plaintiff-appellant against defendants-appellees to quiet title in and to certain mining claims located in the Eureka Mining District, Yavapai County, Arizona. The judgment entered decreed that plaintiff-appellant take nothing by its complaint, ordering the dismissal thereof and that title be quieted in defendants-appellees on their counterclaim. The parties will be hereinafter designated as plaintiff and defendants respectively.

Defendants in their answer to plaintiff's amended complaint have denied it in part and affirmatively alleged that they lawfully located the mining claims involved here at a time when they were open to location, and are now the owners thereof. In addition thereto they filed a counterclaim in which they sought to quiet title in Payday claims 1 to 6 inclusive. Their original notices of location covered ten claims designated as Payday 1 to 10 inclusive, which involved the same area covered by plaintiff's claims but defendants thereafter filed a disclaimer of any and all interest in Payday claims 7, 8, 9 and 10.

In answer to defendants' counterclaim plaintiff alleged in a separate and affirmative defense thereto that J. M. Cobb, a stockholder in plaintiff corporation and managing director of its business and mining operation, and in complete control thereof, did with intent to cheat and defraud plaintiff induce one W. R. Daugherty, then residing at Clovis, New Mexico, to enter upon the claims of plaintiff on July 1, 1954 with instructions to him to relocate said claims in his name; that he informed Daugherty that said claims would be open for location on that date because of the failure of plaintiff to do the assessment work for the year July 1, 1953 to July 1, 1954; that he and some men in Texas were interested in said claims but that none of them intended to "mess" with them any more and he was unable to do any further work thereon; that Cobb then and there knew that such statements were false and made them for the purpose of depriving plaintiff of its lawful interest in said claims. It further alleged upon information and belief that Cobb and defendants had entered into a conspiracy to perpetrate a fraud upon the other stockholders in plaintiff corporation. Plaintiff then prayed that, upon the ground of fraud, defendants' counterclaim be dismissed or in the alternative that the legal title to said claims be decreed to be held in trust by defendants for the benefit of plaintiff.

The facts are that plaintiff was incorporated in 1951 by J. M. Cobb and his Texas associates and the claims here involved were conveyed to it under the direction of Cobb subject to the paramount title of the United States. It continued to be the owner thereof until July 1, 1954 and of course is still the owner unless the location of said

claims by Daugherty on that date terminated said ownership. During the year 1952 plaintiff was actively engaged in mining, taking out what was classified as tungsten ore of undetermined value. The expenditures made in this work was far in excess of the annual labor required in the form of assessments for the year July 1, 1952 to July 1, 1953. However, no affidavit was filed with the County Recorder of Yavapai County showing such work had been performed.

During this period of time J. M. Cobb was, as alleged in plaintiff's answer to defendants' counterclaim, one of the incorporators and a stockholder in plaintiff corporation and manager thereof, and had been given complete charge of its business and mining operation by the Board of Directors of said corporation. He had expended eighty to one hundred thousand dollars furnished him in large part by his Texas associates in the operation of said mine and the purchase of equipment, construction of bunkhouses, etc. However, the assessment work for the year July 1, 1953 to July 1, 1954 was not performed nor was any affidavit filed with the County Recorder of Yavapai County within three months after July 1, 1954 showing said work had been performed prior to July 1, 1954. An affidavit was filed however by one Garth Brown, an employee of plaintiff, purporting to show that the required amount of work had been done upon said claims on behalf of plaintiff between the 1st of July, 1954 and the first day of September 1954. Thirty-five hundred dollars were sent to Cobb during 1953, amply sufficient to do the assessment work, but was used by Cobb prior to June 1953 for paying debts, according to his testimony. During the same period he sold machinery of plaintiff purchased the year previously for approximately $2,000, which he testified was also used for paying debts, including his expenses. Cobb made no accounting to plaintiff at any time for the money spent by him and did not turn over the books of account to plaintiff.

We are presented with eight assignments of error by plaintiff. Assignment No. 1 charges that the Court erred in denying its motion for a new trial giving as its reason therefor that the evidence shows that plaintiff had not done its assessment work for the year July 1, 1953 to July 1, 1954. Plaintiff contends that the evidence conclusively shows that such assessment work was performed by it. There is no evidence whatever to support this claim. The affidavit filed by plaintiff in support of this claim shows that the assessment work was done between July 1, 1954 and September 1, 1954. The law is clear that this work had to be done on or before July 1, 1954. There are no decisions to the contrary. The statute is clear on the point. Its only value is that if Cobb had notified his Texas associates of the imperative need .

that plaintiff's assessment work on its claim be performed prior to July 1, 1954, they probably would have done their assessment work prior to July 1, 1954, instead of doing it after that date.

■ Assignments No. 2 and 4 are to the effect that the Court committed reversible error in not admitting a typewritten statement bearing an October date purporting to show that a compressor was rented by one Edgar Kellis to Cobb, and delivered to him at the mine October 1, 1954, which, if true, would indicate defendants did not complete their location work within ninety days after locating the claims involved. Such a writing constitutes no part of a bookkeeping entry which entitles it to be admitted into evidence under the provision of A.R.S. § 12–2262; 16 A.R.S. Rules of Civil Procedure, Rule 44(q). Mr. Kellis took the witness stand and on cross-examination testified to the date the compressor was delivered. The typewritten statement could have been prepared at any time. It added nothing whatever to the testimony of Kellis. It was not error to reject its admission.

Assignment No. 3 based upon an alleged failure of consideration for the quitclaim deed from Daugherty to defendants for which he, at the time of delivery, received a note from defendants for $10,000 is wholly without merit. The fact that Daugherty attempted to repudiate the deal and return the note does not alter the fact that the note constituted a valuable consideration for the delivery of the quitclaim deed.

■ The Court will next consider assignments No. 7 and 8 and later revert to assignment No. 6. With reference to defendants' instruction No. 6 given by the Court, which forms the basis of assignment No. 7, we hold the instruction correctly states the law in every particular. It assumes no fact for its basis as claimed by plaintiff. The record clearly shows that no assessment work was done during the year July 1, 1953 to July 1, 1954, but does clearly show that the only assessment work done by plaintiff was done during the year between July 1, 1954 and September 1, 1954, and as the Court correctly instructed the jury, it did not have the effect of reviving any legal rights of plaintiff in and to such claims which it had under its original location if Daughtery's locations were valid. Frazier v. Consolidated Tungsten Mines, 80 Ariz. 261, 296 P.2d 447. Title 30, U.S.C.A. § 28, clearly provides that:

"* * * The period within which the work required to be done annually on all unpatented mineral claims located since May 10, 1872, including such claims in the Territory of Alaska, shall commence at 12 o'clock meridian on the 1st day of July succeeding the date of location of such claim."

It therefore necessarily ends on June 30 of that year.

Assignment No. 8 was abandoned by counsel for plaintiff during the course of argument and will therefore not be considered by the Court.

Assignment No. 5 presents a more serious question. It is claimed by plaintiff that the Court committed reversible error in striking from its answer to defendants' counterclaim the defense of fraud alleged to have been committed by J. M. Cobb, organizer of plaintiff corporation, a stockholder therein and managing director of its business and mining operation from its organization up to and sometime in 1954. The fraud alleged is hereinabove set out in detail.

It will be necessary to carefully examine the evidence bearing upon the subject in order to determine whether the ruling of the Court in striking plaintiff's defense of fraud from its answer to defendants' counterclaim constitutes reversible error, and, of course, it must be considered most favorably toward sustaining the judgment of the trial court.

We should perhaps first observe that Mr. Cobb's testimony is not entirely consistent. He was asked the questions:

"Q. In other words, you had complete charge of the mining operations on this group of claims? A. I did.

"Q. And how long did you continue as Managing Director in charge of complete mining operations on these claims? A. Could still be Managing Director today. I have never been notified of any other change.

"Q. You are still Managing Director? A. Just orally sometime during the year of, latter part of '53, I heard orally, and I don't remember who that was from that I was out of the company, that they had reorganized.

"Q. Have you at any time ever submitted your resignation as Managing Director? A. No, sir.

\*    \*    \*    \*    \*    \*

"Q. You don't recall from whom you were told orally that you were out of the company? A. No, I don't believe. The first real notice I received of that was a letter from C. S. Johnson that Mr. Dotson, the former president of the company, and myself had been removed. Where this meeting was held, I do not know."

He was then asked to state approximately when he received the letter from Johnson and he replied he believed it was in 1954 but he couldn't remember. He stated Johnson was a stockholder in plaintiff corporation but was not an officer.

"Q. And the only notification that you had, then, was from a stockholder in the company that you and Mr. — A.

It was from the president of the new organized company, Mr. T. W. Williams at Haskel, Texas."

He further testified that Mrs. Geneva Culp who was the secretary of the company had all the books and cancelled checks of the corporation until she left Prescott in June 1953. He testified further when he talked to her a year previously (1955) (then living in Waco, Texas) she said she had the books and cancelled checks. She said a demand had been made upon her to surrender the books, records and cancelled checks of the corporation. According to the testimony of a Mr. Weaver who was a vice president of plaintiff, Mrs. Culp refused to surrender the records to it upon demand.

Cobb admitted he received $3,500 from Weaver but didn't know whether it was in 1953. He also admitted he sold the power wagon, compressor, jackhammer and other mining tools for approximately $2,000 in 1953, and said there were no mining operations in 1953 but didn't remember what he used the money for. When asked if he didn't pay approximately $10,000 for the machinery the previous year his response was as usual "I don't remember" and declined to approximate its cost. He said he might have received $800 as late as March or April 1953 but did not remember. He said he used it for paying back-bills. He was asked if he didn't get $500 in June 1953 and $500 in September 1953. He responded as usual "I don't remember". He said if he did get it he spent these amounts for labor, etc. When asked if he had any men at work on the claims in 1953, the response was again "I don't remember". He stated he always owed money. There is nothing in the evidence to indicate he made any effort to get the books and records, including cancelled checks from Mrs. Culp in Waco, Texas, or why he, as manager, permitted her to remove the records from Arizona. He testified when he sold the property of plaintiff for approximately $2,000 in the early part of 1953 that "I paid bills with it, my personal expenses as agreed by the company to do." Note the following questions and answers:

"Q. Well, did you advise Mr. Weaver any time in the assessment year of '53 and '54 that the assessment work had not been done of the claims? A. Yes, sir.

"Q. And when was that? A. Well, to the best of my memory it was along the latter part of January in '53. It was the last time. How many times, I don't remember. But I did make a trip down there an talk to them about it."

\* \* \* \* \* \*

"Q. And when did you make that trip? A. I don't remember what month it was. It was in plenty of time.

"Q. Well, approximately what month? A. Oh, February or March, something like that.

"Q. February or March of what year? A. '53."

The witness was then reminded that he was being questioned about the assessment work for the period "July 1, 1953 to June 30, 1954." His answer was: "Well certainly, just got through telling you."

"Q. You just testified, Mr. Cobb, the last time you advised the company was in January of '53, and then that you made a trip down there in February and March of '53. A. Possibly I am wrong on your dates. Give me the question again.

"Q. I am asking you when you advised the Company that no assessment work had been done between the period from July 1st '53 through June 30, '54? A. Oh, From that period I don't remember seeing them.

"Q. You never did advise them to the effect that the assessment work had not been done? A. Had not been done to by recollection, no, I never did.

"Q. And why didn't you do it in your capacity as Managing Director? A. Well, I knew the claims had been relocated.

"Q. That was prior to the relocation of the claims. A. Well, I don't remember your dates.

"Q. I am talking about a period from July 1 '53 through June 30, 1954. A. You asked me did I advise them after.

"Q. During that period of time? A. Well, I don't remember if I did or not. I don't think so.

"Q. You don't think that you did? A. No, I don't.

"Q. And I am asking you now, then, why you did not do so in your capacity as managing director? A. Well, it had been a misunderstanding. We had fallen out, and every meeting we have had, or anything, it just seems like it would be no solution could be worked out, and I just gave up on it. I had no more further funds to carry it.

"Q. You had had a misunderstanding with the other directors of the corporation? A. I wouldn't say a misunderstanding. We just didn't have the money.

"Q. You testified you had a misunderstanding. What did you mean by that? A. Meant just what I said. We just couldn't do it. They said

they didn't have the necessary funds, and I certainly didn't have.

\*   \*   \*   \*   \*   \*

"Q. But you stayed on the job, then, up until around March, then, of 1954? A. I was up at the mine off and on all the time on my own.

"Q. Isn't it true, Mr. Cobb, because of this misunderstanding that you decided yourself that you were going to try and effect a relocation of these claims in the name of somebody else? A. No, sir.

"Q. You have a ten percent interest in them now do you not? A. At this time I do, which they have been offered.

\*   \*   \*   \*   \*   \*

"Q. If you did not advise Consolidated Tungsten that the assessment work had not been done for the period from July 1, 1953 to June 30, 1954, Mr. Cobb, why did you advise Mr. Dougherty that the mines were open for relocation? A. I didn't exactly advise him that. I told him that I was not able to do the work, and I didn't know whether it had been relocated or not. But I am sure that it hadn't been, because it is the truth, I did go up there right before then to see if anybody had. Mr. Dougherty came to my place, and I did tell him about that. There is nothing I could do about it.

"Q. You told him that the claims were open for filing? A. I told him that— Now, that was prior to the time they were open. I told him that I did not have the money to go ahead with my assessment work, and I didn't think I would hear from the boys in Texas.

"Q. Did you tell him that the boys from Texas weren't interested in the claim any more? A. Not to my recollection, no.

"Q. You heard Mr. Dougherty testify, didn't you? A. Yes, I believe I did.

"Q. And if he testified to that effect, would he be telling the truth? A. I don't remember. But I am telling the truth to the best of my memory."

He then testified that he had first met Daugherty at Wickenburg once sometime ago and then he had come to Cobb's place with Cobb's cousin, the former husband of Mrs. Culp. That Mr. Culp sent Daugherty to him. When asked if Daugherty didn't come out solely for the purpose of discussing the matter of relocating the claims involved, his answer was "Well I wouldn't know about that." He stated that he got his ten per cent interest in the claims as relocated from Daugherty. The evidence shows however that Daugherty had previously repudiated his agreement with defendants. Cobb admitted he received a check from Frazier, one of the defendants,

the latter part of September but paid some of it to men who were doing location work on the claims. At the time he hired these men he said he had a ten per cent interest in the claims. Frazier was at his place he said "in 'early 1954' which was followed by the statement, May or June 1954, but didn't talk about these claims."

The witness A. W. Weaver, former vice president of plaintiff corporation, testified that at one time the question of assessment work on the claims for the year July 1, 1953 to July 1, 1954, was discussed (he did not say when Cobb testified he was in Haskel in February or March 1953) and that Cobb told them as well as he could remember, that part of the claims were good and the others would have to have some work done on them by July 17 of '54. Weaver said he reimbursed Daugherty for monies he had expended in relocating the claims after July 1, 1954. He didn't say how much he paid him. This was after Daugherty had attempted to repudiate his relocation of said claims and his agreement with defendants.

Cobb's entire testimony, including that portion relating to his failure to notify his associates in plaintiff corporation concerning the necessity of doing the annual assessment work for the year July 1, 1953 to July 1, 1954, was evasive and conflicting. Again and again he didn't remember occurrences that should have made lasting impressions upon the mind of the ordinary person under similar circumstances. He testified that the last time he notified his Texas associates of the necessity for performing assessment work on plaintiff's claims was in January 1953. In almost the next breath he stated he made a trip to Texas in February or March 1953 at which time he discussed it with them.

As a matter of law no assessment work for the year July 1, 1953 to July 1, 1954 could have been done until July 1, 1953, and it had a whole year from July 1, 1953 to July 1, 1954 in which to do such work. He admitted he said nothing to them about the assessment work in 1954, although he had complete charge of plaintiff's business during that period, and he said at the time he was on the witness stand, so far as he knew, he may still be manager. Under these circumstances, if the action had been against him alone the Court would have been required to submit the question of fraud to the jury. However, an examination of the evidence relating to the alleged conspiracy of Frazier, Fuller and Denton, defendants, with either Cobb or Daugherty discloses that it is totally barren of proof thereof.

Frazier is the only one of the defendants purchasing the claims from Daugherty who testified at the trial. His testimony relating to the question of conspiracy was to the effect that he had only known Cobb since May 1954 when he stopped at Cobb's auto court in Phoenix. This was on an

occasion when he was in Phoenix with another man (who knew Cobb) to look at some gold mining claims in Maricopa County. He didn't recall too much conversation with Cobb at that time. His companion had arranged to meet someone at Cobb's auto court. Neither the name of that person nor that of his companion is disclosed by the record. It may have been Daugherty as they bought three gold mining claims from Daugherty on that trip.

Frazier testified that the first time he ever heard of the claims involved in this case was in the last week in June 1954; that Daugherty whom he had met in May 1954, came to see him in Amarillo, Texas. That Frazier was then ill and confined in the northwest Texas hospital. That Daugherty then told him that he was going to have these claims and would like for Frazier to look at them. Frazier and Fuller went to look at the claims about the middle of July. Cobb took them from Phoenix up to the mine. He testified he didn't know Cobb was a stockholder in the Consolidated Tungsten Mines and that he didn't know of such interest until *after* August 15, 1954. They purchased said claims from Daugherty and got their quitclaim deed from him on August 15.

There is no evidence from any source either from Frazier, Cobb or Daugherty that even tends to show a conspiracy between defendants Frazier, Fuller and Denton, and Cobb and Daugherty, or either of them. Nor are there any circumstances from which such an inference can be drawn. In the absence of proof of the existence of such a conspiracy defendants cannot be lawfully charged with the fraud of Cobb perpetrated against the plaintiff.

■ A conspiracy itself furnishes no grounds whatever for a civil action. It is the doing of the thing for which the conspiracy was formed that furnishes the basis for such civil action. Hale v. Brown, 84 Ariz. 61, 323 P.2d 955.

In the instant case had a conspiracy been proven between Frazier, Fuller, Denton and Cobb to fraudulently procure the ownership of the claims involved, all of the defendants would have been liable although the overt act of fraud was committed only by Cobb or by Cobb and Daugherty.

■ Had a conspiracy been proved the statements of each of the conspirators would have been competent to prove the fact of fraud as against all of them. Page v. Pilot L. Ins. Co., 192 S.C. 59, 5 S.E.2d 454, 125 A.L.R. 872.

No conspiracy having been proved it follows that the trial court correctly withdrew the question of fraud from the jury.

Judgment affirmed.

STRUCKMEYER, C. J., and UDALL, JOHNSON and BERNSTEIN, JJ., concur.