Calvin L. GUY, Plaintiff,

v.

The CITY OF PHOENIX, et al., Defendants.

No. CIV–83–2240 PHX. WPC.

United States District Court, D. Arizona.

May 5, 1987.

Donald Harris, Phoenix, Ariz., and Fred Pain, Jr., Scottsdale, Ariz., for plaintiff.

Richard S. Cohen, Lewis & Roca, Phoenix, Ariz., for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW AND ORDER FOR JUDGMENT

COPPLE, District Judge.

### FINDINGS OF FACT

1. This proceeding involves an action alleging discriminatory conduct in violation of 42 U.S.C. §§ 1981 & 1983, intentional infliction of emotional distress and conspiracy.

2. This action was originally filed on October 13, 1983 in the Arizona Superior Court, and defendants removed it to this Court on the basis that it involved federal statutes, 42 U.S.C. §§ 1981 & 1983. This Court has jurisdiction to hear this matter pursuant to 28 U.S.C. § 1331.

3. The plaintiff, Calvin Guy, is a black former police officer for the City of Phoenix Police Department.

4. The defendants are (1) the employer, the City of Phoenix, a municipal corporation; (2) seven supervisors for the City of Phoenix Police Department—Capts. Ralph Eckert and G.J. Kurtenbach, Lts. Jerry Mulleneaux and Tim Black, and Sgts. Richard P. Elsby, Carl Richardson and Phil Garrigan; and (3) five of the plaintiff's former co-workers, Charles Glisson, John Vredenburg, Ron Bevins, Ron Enos and Jay Thomson; and the various defendants' spouses.

5. Prior to the trial of this matter, Guy voluntarily dismissed his claims against another of his fellow co-workers in the Phoenix Police Department, Clark Carlson.

6. Guy was employed in the Phoenix Police Department from December 5, 1966 until September 30, 1983, when he obtained an accidental disability retirement based upon degenerative disc problems. His last assignment prior to his retirement was as a burglary detective in the South Mountain Police Station Precinct. He worked there from July 1979 until his retirement in 1983. Until 1980 plaintiff had a brilliant career with the department. He was American Legion Officer of the Year once and received numerous awards and commendations.

7. The burglary detail consisted of approximately ten to fifteen detectives who worked together with other personnel in a room at the South Mountain Precinct.

8. During all times relevant to this lawsuit, there were approximately 230 sworn and non-sworn employees at the South Mountain Precinct under the command of a Captain.

9. The precinct is manned 24 hours a day, 365 days per year. There are three eight-hour shifts which are staggered so that there is overlap between the shifts.

10. While the detectives, including the plaintiff, all had desks in the same room, the plaintiff's sergeants, the lieutenants, and captains had individual offices outside that room; the captain's office generally was located in a separate building on that property.

11. From the time that Calvin Guy transferred into the burglary detail until January 3, 1982, his immediate supervisor was Sgt. Richard Elsby.

12. On January 4, 1982, defendant Sgt. Richardson was assigned to the burglary detail where he served until January 13, 1985. From January 4, 1982 until March 22, 1982, Richardson was Guy's immediate supervisor.

13. On January 20, 1981, defendant Phil Garrigan was assigned to the South Mountain Precinct as a patrol sergeant. He was assigned as a second sergeant to the burglary detail on March 22, 1982 and was Guy's immediate supervisor for the remainder of time that Guy served at the South Mountain Precinct.

14. Defendant Capt. Ralph Eckert served as captain at the South Mountain Precinct, including the burglary detail, from May 5, 1980 through October 19, 1981.

15. Defendant Capt. G. Kurtenbach served as captain at South Mountain Precinct, including the burglary detail, from October 26, 1981 for the remainder of time that Guy served at the South Mountain Precinct.

16. Defendant Jerry Mulleneaux served as lieutenant of the burglary detail at the South Mountain Precinct from October 17, 1980 to December 6, 1981.

17. Defendant Timothy Black was assigned as a lieutenant at the South Mountain Precinct on December 21, 1981. He served as lieutenant of the burglary detail from August 9, 1982 for the remainder of time that Guy served at the South Mountain Precinct.

18. Defendant Ron Bevins, a co-worker, served as a detective in the burglary detail from July 9, 1979 through September 4, 1983.

19. Defendant Ron Enos, a co-worker, served as a detective in the burglary detail from July 9, 1979 through September 6, 1982.

20. Defendant Charles Glissen, a co-worker, served as a detective in the burgla-ry detail from July 9, 1979 through February 28, 1982.

21. Defendant J. Thomson, a co-worker, served as a detective in the burglary detail from March 31, 1980 through April 11, 1982.

22. Defendant John Vrendenburg, a co-worker, served as a detective in the burglary detail from August 9, 1982 through September 4, 1983.

23. This lawsuit does not constitute the first time that plaintiff has made claims of racial discrimination in connection with his employment. In the mid–1970's, at a time when he was a member of the Arizona National Guard, Guy also lodged a racial discrimination charge against the Guard for, among other items, a failure to be considered for selection for a flight leader position harassment by his sergeant, "prejudiced and biased" investigations, and other conduct by the Guard.

24. On July 16, 1979, the Office of Human Resources of the Army and Air Force National Guard Bureau concluded that Guy's allegations of racial discrimination had not been substantiated. Shortly thereafter, Guy resigned from the Guard.

25. During 1978–1979, at the same time that the National Guard investigation was ongoing, the plaintiff sought counselling at the South Phoenix Community Mental Health Center due to great stress. The medical records from that period identify Guy as being generally unable to cope with daily environmental pressures, subject to delusional thinking, lapses of memory, and in need of long-term counselling. Guy was also described as someone who felt persecuted and generally taken advantage of, who had become depressed and withdrawn, and who had developed ideas of persecution about his experiences with the National Guard.

26. The medical testimony at trial confirmed that the general condition of this paranoid personality disorder, and Guy's physical complaints of nausea, inability to sleep, headaches, delusions, loss of memory, and so forth, have essentially remained unchanged since 1978–79.

27. Guy transferred to the South Mountain Precinct in late July 1979, within one week of the National Guard's decision adverse to him.

28. Six months after his transfer to the South Mountain Precinct, Guy was involved in an on-duty accident with defendant Ron Enos on January 11, 1980.

29. After the 1980 accident, Guy frequently began to call in sick and regularly take sick leave. This continued, and in fact increased substantially in 1982 and up to the time of Guy's retirement in 1983.

30. Periodically after his accident Guy applied for temporary compensation benefits with the State Compensation Fund. He would then return to work, after being released for full duty status as a police officer.

31. About that same time, a number of pranks and practical jokes occurred in the burglary detail office. These included such things as the making of plastic name labels which were placed on the officers' chairs; entering of false log entries in the burglary detail's copy of the "Exceptional Incident Log Book"; tampering with the detectives' chairs so they would tip over when the unsuspecting detective sat in it; paging detectives with phony telephone calls; and other similar behavior.

32. Guy claims that these numerous instances of pranks were a concerted effort to discriminate against him on the basis of his race. Testimony by Guy himself, the co-worker defendants and other neutral witnesses at trial establishes, however, that virtually all workers in the burglary detail were subject to these same and similar pranks and practical jokes. Moreover, pranks of this nature occur in other precincts to officers of all races.

33. Further, the evidence at trial did not establish that any of Guy's supervisors were invovled in the pranks or joking or that they had any knowledge that the overwhelming majority of these pranks were occurring. Guy's own testimony established that whenever he did complain to his supervisors about the joking, action was taken to stop the horseplay. Thus, for example, when Guy complained to Sgt. Els-

by about the label makers tags, Sgt. Elsby immediately addressed the squad and had the labelmaker locked up and signed out. After Elsby left and some pranks continued, defendant Sgt. Richardson, upon seeing same, put a final stop to it.

34. Guy specifically considered a few of these pranks and jokes to be "racial" in nature. For example, he claims he was identified on a party list as the individual who would bring "watermelons and pork rinds and stuff." The testimony of numerous officers indicated, however, that these pranks did not even occur.

35. Furthermore, even to the extent that these events may have occurred, they were isolated and sporadic. Most were not malicious, intentional racial descrimination, many were. Further, at no time prior to filing his discrimination claim with the city EEO on January 21, 1983, did Guy ever complain to any of his supervisors or anyone else that any pranks or other jokes constituted racial harassment or racial discrimination.

36. The officers at the South Mountain Precinct, when dealing with black suspects, would sometimes call them "nigger." Guy, his co-worker defendants and all neutral witnesses also testified, however, that no one had ever used that term in addressing Guy or other black officers. The testimony showed that such language, when used, was directed to unruly black suspects, or particularly offensive actors—such as dealers who sold drugs to children—and it was used as a device to vent frustration. In a similar vein, white suspects were often described as "white trash" or "poor trash." The evidence showed that the term was used in this context by both black and white officers. Further, the plaintiff conceded that he had never suggested or complained to his supervisors about the use of such language in that or any other context.

37. Plaintiff also offered at trial, as additional evidence of the racially discriminatory environment he claimed to have worked in, certain photographs and hateful literature which can best be described as "KKK-type materials." Guy claimed that

he found these items on his desk or in his files at varying times, and he also testified he has no idea who put them there.

38. The defendants and other neutral witnesses who worked with Guy from day-to-day testified that they never saw such photographs or literature in the burglary detectives' office.

39. Guy never told his supervisors that he had received the KKK-type materials.

40. Most of the KKK-type materials surfaced for the first time at Guy's deposition taken in October 1984, long after this case was filed. Guy did not show these materials to the EEOC, the City EEO Office, or the Department of Justice, despite the fact that he filed claims of discrimination with all of them prior to filing his lawsuit. Guy had, however, advised certain agencies of the pranks which he viewed as racially motivated and, in addition, his belief that he felt he was being harassed regarding his use of sick leave.

41. There are serious questions whether any of these racially motivated materials were placed on Guy's desk by anyone. In any event, Guy's evidence fails to link any defendant to these materials, either in terms of participation or knowledge.

42. The evidence does not establish that the atmosphere in the detectives' bureau was such a "racially charged" one that it can simply be assumed that Guy's supervisors knew or should have known that such materials were around, especially when the officers who actually worked in the same room as Guy never saw them.

43. In July 1981, defendant Garrigan was transferred to the South Mountain Precinct and on March 22, 1982 he became plaintiff's immediate supervisor.

44. Defendant Garrigan was viewed by plaintiff, the co-worker defendants and neutral witnesses alike as being a "tough sergeant" who had very high performance expectations of the officers working under him. This at times created friction within the detail and also resulted in adverse actions being taken against the officers for failure to perform their jobs. One white officer testified, for example, that he re-ceived a 16-day suspension and was transferred from the detectives' bureau. Also, neglect of duty memoranda were issued for various other white officers, including defendants.

45. After Sgt. Garrigan's assignment to the detectives' bureau, a number of Guy's fellow co-workers, including defendants Charles Glisson, Ron Enos and Jay Thomson, transferred out of the detectives' bureau.

46. Guy's complaint concerning Sgt. Garrigan is that he racially discriminated against him because Garrigan insisted that Guy reduce his sick leave and bring in doctors' excuses. The evidence shows, however, that Guy was not disparately treated with respect to these matters; Ron Enos, a white officer, was also counseled about sick leave and required to bring in doctors' excuses in the same time frame.

47. The City's personnel rules specifically gave supervisors in any department, including the police department, discretion to receive doctor's excuses in extreme cases of absenteeism. Calvin Guy's absenteeism was extreme. Captain Kurtenbach, in fact, testified that Guy's absenteeism was the worst of any officer he had ever supervised in his chain of command. Many officers testified as to the impact that plaintiff's frequent absenses had on this small squad.

48. Further, in 1982, a memo was sent from the City Manager's Office to the heads of all departments, stressing the need to reduce the use of sick leave.

49. The police department's general orders also allow for transfer in a case such as Guy's, and the plaintiff's previous requests for transfer had in fact been granted. In addition, upon the production of medical evidence that an officer cannot physically perform all functions of a police officer, he can transfer to light duty. Guy never asked for a transfer or light duty, even though these avenues were available to him.

50. While the evidence shows that Sgt. Garrigan tended to run a tight ship in the detectives' bureau, it does not establish any

singling out or racially discriminatory treatment of the plaintiff.

51. Plaintiff complained to Assistant Chief Ben Click in approximately August of 1982 that he was being unfairly counseled in regard to his use of sick leave. Plaintiff did not discuss or suggest that the acts constituted racial harassment. When Click asked plaintiff how his back was and when he thought it might get better plaintiff interpreted this as racial and left.

52. Plaintiff's first complaints about both the use of sick leave counseling and racial harassment were made in 1983.

53. By that time, virtually all of the alleged acts of harassment, with the exception of Guy's counseling as to sick leave, were almost two years old; they related to the pranks in the detectives' bureau in 1980–81. Many of Guy's co-workers and the supervisor who had been at the South Mountain Precinct at the time of the those pranks were no longer there.

54. When he complained in 1983, Guy was offered the opportunity to transfer to another department if he chose to do so, but he refused.

55. Guy testified that most of the pranks had discontinued as of the end of 1981 and early part of 1982.

56. On approximately October 1, 1983, Guy was retired with pension benefits due to degenerative disc back problems.

57. The Phoenix Police Department Chief of Police since 1980 has been Ruben Ortega, a Hispanic. Guy knew Ortega on a personal level for many years prior to the time Ortega became Chief of Police.

58. In approximately 1980 or 1981, Guy became aware that Ortega had demoted an officer based upon one remark by the officer that the Chief interpreted as being racially derogatory against blacks. During the entire period that Guy allegedly was being victimized by racial harassment, he never advised Chief Ortega of any problems he was having at the job.

59. During all times relevant to this lawsuit, the Phoenix Police Department has maintained policies of equal employment opportunity and affirmative action on be-

half of blacks and Hispanics. In fact, plaintiff's picture was used in recruitment materials.

60. During all times relevant to this lawsuit, the city has maintained its own equal employment opportunity office which, in part, investigates internal complaints of discrimination by city employees.

61. The City of Phoenix Police Department has also maintained an employment services bureau which coordinates with the city's general equal employment office.

62. During 1980, 1981 and 1982, the time that Guy alleged racially derogatory materials were placed on his desk, he never complained about them either to the police department's employment services bureau or to the city's EEO office.

63. In support of the foregoing findings of fact and the conclusions of law to follow the Courts more detailed findings and analysis are set forth in the sub-paragraphs below:

a) The Court finds the testimony of Dr. Sheely, psychiatrist, substantially more credible than that of the defense psychiatrist. Dr. Sheely testified that plaintiff has personality disorders of long standing that antedate his police department employment and are not susceptible to treatment. He labeled these as histrionic and narcisstic. He listed symptoms as: apt to overreact, egocentric, paranoia, lack of empathy, withdrawn, martyr complex, feeling of superiority, exaggeration of importance of minor incidents and need for confirmation and vindication of his complaints by punishment of others such as a money award. The late and respected Dr. Tuchler diagnosed a persecution complex and paranoid personality. Dr. Abyanker, who first saw plaintiff in 1978 at the South Mountain Mental Health Clinic, in January 1979 stated that plaintiff was suspicious and appeared delusional. When first examined at the South Mountain Mental Facility in 1978 plaintiff complained of delusions, loss of memory, and misinterpretation of the motives of other people. Dr. Barber, a clinical psychologist who has treated plaintiff since June, 1983 stated that earlier reports from

South Mountain Mental Health Clinic indicate a personality change after the National Guard incident. Dr. Sheely stated that plaintiff could function well for a number of years and then exhibit the predicted symptoms after some major perceived disappointment. Apparently the National Guard finding of no validity as to his claims of racial discrimination was such an event, as were plaintiff's sick leave problems which clearly were not racially motivated.

b) Plaintiff's own testimony and the facts regarding events in 1980 until he retired in 1983 accurately mirror the symptoms described by Dr. Sheely. His testimonial discrepancies as to critical dates when he saw or found the racial material (exhibits 1–21) is apparent when comparing his deposition answers, affidavits, answers to interrogatories and his testimony at trial. While some material does show racial animosity, i.e. exhibits 7, 8, 9, 10, 12, etc. there is no evidence from which the Court can even guess who is responsible for these. For instance exhibits 7 & 8 were published in the early 60's and were distributed as late as the 70's. Plaintiff testified that they appeared on his desk during the night shift in late 1982 or early 1983. It is more likely that plaintiff had kept these items, found them in boxes in 1984 when he first showed them to defense counsel and believed that he received them at the South Phoenix squad room. By late 1982 most of the defendants were no longer at the South Mountain Station Burglary Squad and there is no evidence who worked with him on the night shift. Plaintiff says he found them on his desk or in his file folders. Yet he kept his desk locked. He testified that people were getting in his desk because detective Glisson had custody of the duplicate keys. This is simply untrue. Plaintiff and another witness testified that when a baby gorilla was born, unnamed officers asked if he was going to pass out cigars. This event could not have happened during the 1980–83 period because the gorilla baby was born in 1975. One witness testified that he remembered the incident but thought it occured before the squad moved to South Phoenix Precinct in 1979. Con-

sistent with Mr. Sheely's diagnosis, plaintiff lost an appeal to the state board that had denied his application for industrial compensation and he testified that this was the result of a conspiracy with the police department. He also wrote the administrative judge and accused him of racial bias and conspiracy with the department. He further attributed the fact that Sgt. Garrigan became his supervisor at South Mountain to a conspiracy between Garrigan and the department to get him—the plaintiff. The record is replete with testimony by plaintiff and others that seriously affects his credibility and memory.

c) Since his 1980 injury accident plaintiff has suffered a severe degenerative disc disease which resulted in his sick leave problems (the *only* thing he ever complained about prior to his January 1983 complaint to the city EEO and even that was based primarily on his sick leave problems and a claim that it showed racial bias) his orthopedic physician suggested that he get a desk or light duty job and wrote two letters for plaintiff making such a recommendation. Plaintiff refused to request a transfer or show the letters to his supervisor.

d) In April, 1983, plaintiff visited Dr. Abyanker and she ordered a two week stress leave. Capt. Kurtenbach, concerned about one of his officers, conferred with the doctor to find out the problem. She told him plaintiff was paranoid and needed a job with less pressure but she could not discuss the details without plaintiff's permission. The captain explained the various jobs available and learned plaintiff was not fit for a patrol job so suggested a "call-back" desk job at South Mountain. The doctor agreed that it would be suitable. When the captain asked for a letter to support such a recommendation she stated she would have to get plaintiff's approval. The captain heard nothing more from either of them. Dr. Sheely explained plaintiff's refusal to transfer to another job where his sick leave would not be a problem as an example of the martyr complex.

e) It is true that during the 1980–83 period plaintiff suffered from stress that ag-

gravated his 1980 back injury. The stress was primarily due to:

1. The finding by the National Guard that his claims of racial discrimination were unfounded.

2. The refusal of the Industrial Commission to reopen his claim arising from the 1974 accident.

3. Sgt. Garrigan becoming his supervisor again.

4. The threat to transfer him if he didn't reduce his sick leave. This was consistent with the suggestions of his own doctor, psychiatrist and psychologist.

Plaintiff viewed all these actions as racial discrimination. In fact they were totally unrelated to race.

f) The only evidence from which the Court can determine who was responsible for any of exhibits 1 through 21 relates to exhibit 13, plastic label tapes and exhibit 14, phony "Exceptional Incident Log" reports. Some of these were admittedly prepared by two of the defendant detectives. When plaintiff complained to defendant Sgt. Elsby, sometime in 1981, he confiscated the label gun and effectively stopped that. The log entries were stopped when Sgt. Richardson, who heard no complaints from plaintiff, saw the January 26, 1982 phony entry and stopped that practice. In any event, while the labels and log entries may indicate an Archie Bunker mentality, and were insensitive and insulting, they were not motivated by the racial animus required by 42 U.S.C. § 1981 or an intent to harass plaintiff into resigning from the police department. All of the other detectives, including one who is part Polish and one who is Hispanic, received the same treatment without resentment or feeling of racial bias. The Court finds that the required proof of discriminatory intent on the part of the only defendants who can be identified as responsible for any of exhibits 1 through 21 is lacking.

g) These sub-paragraphs are but a few of the many examples to be gleaned from the testimony in this case from medical personnel and plaintiffs own sworn statements and testimony under oath, of illogic and inconsistencies that must be weighed in evaluating plaintiff's claims. They all reinforce the diagnosis of Dr. Sheely, Dr. Abyanker and Dr. Barber. They highlight plaintiff's evidentiary problems in view of his burden of proof. He has simply not carried that burden of proof in this case.

## CONCLUSIONS OF LAW

### A. *42 U.S.C. § 1983 Claim:*

1. Before a prima facie case of discrimination can be established under § 1983, there must be conduct by someone acting under color of state law, and the conduct must deprive the plaintiff of rights secured by the Constitution or the law of the United States. *Parratt v. Taylor*, 451 U.S. 527, 535, 101 S.Ct. 1908, 1913, 68 L.Ed.2d 420 (1981). The actions complained of here were not carried out under color of state law. The acts were in no way related to the performance of duties as police officers. *Screws v. U.S.*, 325 U.S. 91, 65 S.Ct. 1031, 89 L.Ed. 1495 (1945). Section 1983 does not create any substantive rights; rather it merely provides for the deprivation of rights established elsewhere. *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 105 S.Ct. 2427, 2432, 85 L.Ed.2d 791 (1985).

2. Before municipal liability under § 1983 could be imposed against the City of Phoenix, Guy would have to show that the discrimination against him was caused by an existing, unconstitutional municipal policy or custom. *City of Oklahoma City v. Tuttle*, supra at 2436. Further, he must show that the injury suffered was at the hands of a municipal decision maker. *Id.*

3. The evidence does not include proof that any of the incidents plaintiff complains of were caused by an existing, unconstitutional municipal policy, which policy can be attributed to a municipal policy maker. Accordingly, § 1983 liability against the municipality, the City of Phoenix, has not been proven.

4. To prove liability against supervisors, plaintiff must also establish an "affirmative link" between the occurrence of

the various incidents of alleged police misconduct, and the adoption of a plan or policy by the supervisor showing their authorization or approval of such misconduct. *Rizzo v. Goode,* 423 U.S. 362, 371, 96 S.Ct. 598, 604, (1976).

5. Like the requirement for imposing § 1983 liability upon a municipality, the imposition of liability upon a supervisor can occur only where there is proof if "an existing unconstitutional policy", that is, either direct personal participation by supervisors in discrimination or their authorization of a series of acts by others which they know or reasonably should know would cause others to inflict the constitutional injury. *City of Oklahoma City v. Tuttle,* 471 U.S. 808, 105 S.Ct. 2427, 2436, 85 L.Ed.2d 791 (1985); *Johnson v. Duffy,* 588 F.2d 740, 743–44 (9th Cir.1978).

6. The evidence does not show or suggest that any of the defendant's supervisors directly participated in any racial discrimination against the plaintiff. The evidence also does not show or suggest that the defendant's supervisors knew of or employed policies or procedures which authorized any acts that would result in the infliction of the requisite injury.

7. The Court finds that plaintiff has not carried his burden to establish a § 1983 claim against his supervisors.

8. For the same reasons, this Court finds that Guy has not proved his § 1983 claim against the individual defendants. Whoever was responsible was not acting under color of state law. Further, conduct by individuals which is designed to harass and embarrass does not constitute denial of a cognizable liberty or property interest in a claim brought under § 1983. *Western Reserve Oil and Gas Co. v. New,* 765 F.2d 1428 (9th Cir.1985). Plaintiff's racial harassment complaint, to the extent it exists at all, has its substantive basis under Title VII. Co-workers cannot be sued under Title VII, however, and a plaintiff cannot bring an action under § 1983, based upon Title VII, against a person who could not be sued directly under Title VII. *Heubschen v. Department of Health &*

*Social Services,* 716 F.2d 1167 (7th Cir. 1983).

**B. *Plaintiff's 42 U.S.C. § 1981 Claim:***

1. Racial harassment, standing alone, does not abridge the right to "make" or "enforce" contracts conferred by § 1981. *Patterson v. McLean Credit Union,* 805 F.2d 1143 (4th Cir.1986). In a § 1981 action, there must be a tangible interference with plaintiff's economic interest—i.e., § 1981 only provides a remedy for racially motivated employment discrimination which results in or impacts upon an employment decision affecting the plaintiff.

2. A § 1981 claim also requires a showing of intentional discrimination with racial animus. *Taylor v. City of St. Louis,* 702 F.2d 695 (8th Cir.1983).

3. An employer cannot be held liable for every racial or other slur by a nonsupervisory member of its workforce. *Johnson v. Bunny Bread Co.,* 646 F.2d 1250 (8th Cir.1981); *Howard v. National Cash Register,* 388 F.Supp. 603, 606 (S.D. Ohio 1975). Even assuming a pure harassment claim is cognizable under § 1981, Guy would have to show that the city or its agents (i.e., supervisors) directly participated in the racial harassment, or he must demonstrate that management (i.e., the city or its supervisors) consciously failed to take adequate steps to remedy the situation when they were aware that the harassment was occurring. See id.; *Vaughn v. Pool Offshore Co.,* 683 F.2d 922 (5th Cir. 1982). The incidents complained of in this action were not so open and pervasive as to constitute constructive notice to the defendant city or plaintiff's supervisors of the claimed racially biased atmosphere in the South Mountain Burglary Squad.

4. The Court finds that the evidence fails to establish the elements necessary to establish a claim against the city or its supervisors under § 1981. Further, the Court finds that no employment action involving or affecting the plaintiff was motivated by racial animus or intent to discriminate.

5. As to the nonsupervisory co-worker defendants, dismissal of the § 1981 claim against them is also proper because § 1981 requires the existence of a contract, and no contract existed between the co-employees. *See Johnson v. Railway Express Agency, Inc.*, 421 U.S. 454, 95 S.Ct. 1716, 44 L.Ed.2d 295 (1979). Nonsupervisory co-workers are not subject to suit under Title VII and, for the same reasons, cannot be subject to liability for an adverse employment action under Section 1981 in this case.

C. *Plaintiff's claim of intentional infliction of emotional distress:*

1. To prove a claim of intentional infliction of emotional distress, Guy is required to show "conduct so outrageous in character, so extreme in degree, as to go beyond all bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community." *Hixon v. State Compensation Fund*, 115 Ariz. 392, 565 P.2d 898, 899–900 (App.1977).

2. None of the particular actions about which Guy complains and which there is evidence to identify the perpetrator are sufficiently extreme and outrageous to support a claim for intentional infliction of emotional distress. Clearly some of the items in exhibits 1 through 21 fit that category. However, as the Court has noted, credible evidence as to exactly when and from whom plaintiff received these items is totally lacking.

D. *Conspiracy:*

1. Arizona does not recognize the existence of a tort of "conspiracy." A conspiracy itself furnishes no grounds whatsoever for a civil action. It is the doing of the thing for which the conspiracy was formed that furnishes the basis for such civil action. *Consolidated Tungsten Mines v. Frazier*, 87 Ariz. 128, 348 P.2d 734 (1960); *Hanson v. Stoll*, 130 Ariz. 454, 636 P.2d 1236 (App.1981).

2. Plaintiff has failed to prove the underlying alleged unlawful acts. Since the Court finds no unlawful acts occurred, there can be no conspiracy violation. The Court also adds, nevertheless, that there was no evidence that any of the defendants conspired against Guy in any way whatsoever.

3. Further, to the extent that plaintiff attempts to recover on common law claims which arise out of and were incurred in the course and scope of his employment with the Phoenix Police Department, his claims are precluded by Ariz. Rev.Stat. § 23–1022(A) which provides that workman's compensation is the exclusive remedy for such injury. The Court further finds that plaintiff's evidence has failed to place him in the category of exceptions provided by Ariz.Rev.Stat. § 23–1022(A).

IT IS ORDERED:

Counsel for defendants will promptly lodge a proposed form of judgment consistent with the foregoing.