885 P.2d 160

**CITY OF PHOENIX; Gregory Edgcombe; and Michael Sechez; Maricopa County, Defendants–Petitioners,**

v.

**SUPERIOR COURT of the State of Arizona, In and For the COUNTY OF MARICOPA, The Honorable Michael A. Yarnell, a judge thereof, Respondent Judge, Michael J. SMITH, Real Party In Interest.**

No. 1 CA–SA 93–0327.

Court of Appeals of Arizona, Division 1, Department B.

Aug. 4, 1994.

As Corrected Sept. 19, 1994.

Review Granted on issues B, C, and D and Denied on other issues Dec. 20, 1994.

Jones, Skelton & Hochuli by Georgia A. Staton, David C. Lewis, Phoenix, for defendant-petitioner City of Phoenix.

Richard M. Romley, Maricopa County Atty. by Michael G. Sullivan, Deputy County Atty., Phoenix, for defendant-petitioner Maricopa County.

Ely, Bettini, Ulman, Insana & Turley by J. Wayne Turley, Phoenix, for real party in interest.

## OPINION

CONTRERAS, Judge.

Petitioners City of Phoenix ("City"), certain of its police officers ("police defendants"), and Maricopa County ("County") (collectively "defendants") bring this special action from the Maricopa County Superior Court's denial of their motions for partial summary judgment. The defendants contend that the trial court improperly denied their motions for summary judgment which were based on qualified immunity when it deferred certain factual issues for later jury determination. The defendants urge that such matters must be decided as a matter of law well in advance of trial. The defendants City and County also contend that they are entitled to qualified immunity because the Real Party in Interest, Michael J. Smith ("plaintiff"), failed to allege a violation of a clearly established right, or, in the alternative, that the plaintiff failed to link any constitutional injury to a policy or custom within the municipal governmental structure. This court accepted jurisdiction and stayed the proceedings in the superior court pending the issuance of this opinion. For the reasons stated below, we grant, in part, the relief requested.[1]

## JURISDICTION

■■■ Generally, this Court declines special action jurisdiction of petitions seeking review of orders denying motions to dismiss or motions for summary judgment. *United States v. Superior Court,* 144 Ariz. 265, 269, 697 P.2d 658, 662 (1985); *Scottsdale Publishing, Inc. v. Superior Court,* 159 Ariz. 72, 74, 764 P.2d 1131, 1133 (App.1988). We acknowledge that when 42 U.S.C. section 1983 claims are brought in state courts, the state procedural rules apply only so long as they

---

1. Although we have pendant jurisdiction over the state law claims of false imprisonment and mali- cious prosecution, in the exercise of our discretion, we decline to assert that jurisdiction.

do not obliterate the federal right. *Henke v. Superior Court*, 161 Ariz. 96, 99, 775 P.2d 1160, 1163 (App.1989) (citing *Maine v. Thiboutot*, 448 U.S. 1, 100 S.Ct. 2502, 65 L.Ed.2d 555 (1980)). It is well established in federal courts that when the plaintiff advances a claim under section 1983, the defendants may immediately appeal an order denying either a motion to dismiss or for summary judgment in which the defense of immunity has been asserted, but only if the outcome turns on a question of law. *Mitchell v. Forsyth*, 472 U.S. 511, 527–28, 105 S.Ct. 2806, 2816, 86 L.Ed.2d 411 (1985). Our general policy of declining to accept jurisdiction of these requests for review therefore should yield to the federal practice of allowing an immediate interlocutory appeal in section 1983 immunity claims. We agree that if governmental immunity is to protect government officials from even the possibility of a law suit, questions of immunity should be resolved at the earliest possible opportunity. This Court has, in fact, ruled that the "defendant in a section 1983 action should not be required to await final judgment in order to challenge a trial court's adverse ruling on the issue of immunity from suit." *Henke*, 161 Ariz. at 100, 775 P.2d at 1164.[2] Thus, this court has jurisdiction over this claim to the extent that it presents a question of law. *See, e.g., Golino v. City of New Haven*, 950 F.2d 864, 868 (2d Cir.1991), *cert. denied*, — U.S. —, 112 S.Ct. 3032, 120 L.Ed.2d 902 (1992).

■■■ We must initially determine whether the section 1983 issues presented in this petition may be decided as a matter of law. Plaintiff argues that this Court should not accept jurisdiction because disputed factual issues remain and such issues must be decided by a jury. Plaintiff relies on *Golino*, 950 F.2d at 868 ("Where the [trial] court has ruled that adjudication of the immunity defense requires resolution of genuinely disputed questions of material fact, the denial of summary judgment is not immediately appealable."), and *Chamberlain v. Mathis*, 151 Ariz. 551, 554, 729 P.2d 905, 908 ("If the existence of immunity turns on disputed fac-

tual issues, the jury determines the facts....."). We disagree. While these cases suggest that the disputed reasonableness of the defendants' actions is a jury issue, both *Chamberlain* and *Golino* pre-date the United States Supreme Court's holding in *Hunter v. Bryant*, 502 U.S. 224, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991), where the Court made clear that the application of qualified immunity is never a jury issue. The plaintiff in *Hunter* brought a 42 U.S.C. section 1983 suit against two Secret Service agents contending he was arrested without probable cause or a warrant. The agents asserted qualified immunity as a defense. The Ninth Circuit Court of Appeals concluded that the reasonableness of the agents' conduct was an issue for the jury, but the Supreme Court disagreed, stating:

> This statement of law is wrong for two reasons. First, it routinely places the question of immunity in the hands of the jury. Immunity ordinarily should be decided by the court long before trial. Second, the court should ask whether the agents acted reasonably under settled law in the circumstances, not whether another reasonable, or more reasonable, interpretation of the events can be constructed five years after the fact.

*Id.* at 228, 112 S.Ct. at 537 (citations omitted). Thus, the disputed factual issues surrounding the objective reasonableness of the defendants' conduct is a question of law for the purposes of this section 1983 claim, and we may properly accept special action jurisdiction.

## FACTUAL BACKGROUND

Victim C, a single white female, was brutally assaulted during the early morning hours of January 26, 1991, by a man who broke into her apartment located in the 13000 block of North First Place in Phoenix. The assailant demanded the PIN access number for her bank card, an act unusual in connection with a sexual assault. The victim eventually escaped through a patio door and

---

2. The federal cases cited herein may properly be relied on for authority. *See Henke*, 161 Ariz. at 100 n. 6, 775 P.2d at 1164 n. 6. Moreover, we are not limited to the authority cited in either party's briefs in our resolution of this matter. *Elder v. Holloway*, — U.S. —, 114 S.Ct. 1019, 127 L.Ed.2d 344 (1994).

ran to a neighboring apartment where she called the police. The assailant pursued her briefly, but apparently returned to the apartment to remove some of her property. The victim last saw the assailant as he was fleeing on foot.

The victim described her assailant as a muscular black male, 28–34 years old, with fine features, wide eyes, and bushy eyebrows. He used profanity and was abusive. The assailant was clad in ankle length cotton type tights and soft—possibly leather—gloves. Based in part on this information, and on sightings under suspicious circumstances of a person matching the assailant's description by several other individuals in an apartment complex at the 10000 block of North Seventh Street, the police investigation centered on plaintiff.[3] Later that same afternoon, Detective Roberts of the Phoenix Police Department showed victim C six black and white photographs depicting six different individuals; victim C selected the plaintiff's photograph and identified him as her assailant. Based on this identification, the police arrested the plaintiff on the afternoon of January 26, 1991. A complaint was filed on January 29, 1991, and, on February 6, 1991, the grand jury returned an indictment against the plaintiff for attempted sexual assault of victim C and one count of second degree burglary of her apartment.

On February 3, 1991, victim D, also a single white female, was sexually assaulted by a man who broke into her home during the early morning hours, demanded her PIN number, and took her bank and credit cards. Detective Edgcombe thought the crime was very similar to the assault of victim C and he felt compelled to determine whether the plaintiff was still in jail. He was. A short time after the assault on victim D, the police detained a suspicious person who was fleeing the scene by car. This person matched the description victim D gave to the police and he was identified as Warren Isaac. On Feb-

ruary 19, 1991, the police recovered victim C's purse, credit cards, and other property from an apartment Isaac shared with his girlfriend. At this point, Sergeant Pizzi of the Phoenix Police Department talked to the deputy county attorney and urged him to drop the charges against the plaintiff.

The deputy county attorney, however, did not immediately disclose the exculpatory information to the plaintiff's criminal trial attorney, nor did he dismiss the charges. Instead, the deputy county attorney arranged for a live lineup in which both the plaintiff and Warren Isaac appeared. Victim C identified the plaintiff saying, "He looks like the man who came into my house." Plaintiff argues that this lineup identification was tainted by victim C's prior identification of him in the collection of photographs presented to victim C for identification. Plaintiff also contends that this lineup was flawed because the police did not show victim C a photograph of Isaac, nor did they tell her that they had another suspect. The police also conducted a voice identification comparison and victim C identified the plaintiff's voice. The plaintiff contends, however, that because the victim could see each subject as he gave an exemplar, the visual identification tainted the voice identification. The police were unable to find any fingerprints or other physical evidence tying plaintiff to victim C's apartment. Moreover, victim C was never able to specifically identify the plaintiff's clothing as belonging to her attacker. In short, it appears that the only evidence tying plaintiff to victim C's assault was the identification by victim C herself. The plaintiff remained in jail and the case continued toward an anticipated trial.

Nine months after the plaintiff's arrest, Lieutenant Thiele became the new supervisor in the Sex Crimes Unit of the Phoenix Police Department. After reviewing the plaintiff's case with Sergeant Pizzi and others, Thiele

---

**3.** Plaintiff was a former tenant of the Seventh Street complex. Detective Edgcombe received information that a person matching the plaintiff's description had been seen by residents and staff of the Seventh Street complex. These individuals saw the suspicious person hiding in the bushes, peeking in windows, and following women about the complex. Two of these daytime sightings were followed immediately by burglaries of apartments rented by women in the same buildings around which the suspicious person had been spotted. The manager and maintenance workers at the Seventh Street complex told police they thought that the plaintiff might be the person who had been frequenting the apartment complex.

approached the deputy county attorney and suggested that he dismiss the case. The deputy county attorney agreed, but only if the plaintiff could pass a polygraph test. Although the polygraph test results came back as "inconclusive," the deputy county attorney nonetheless moved to dismiss the charges against the plaintiff based on "new evidence." The plaintiff was released and the charges were dismissed on October 8, 1991.

The plaintiff then filed suit in Superior Court and named the City of Phoenix, Detectives Edgcombe and Sechez, and the County of Maricopa as defendants. His complaint sought damages for negligent investigation, intentional infliction of emotional distress, breach of contract, malicious prosecution, false arrest, false imprisonment, and a violation of civil rights under 42 U.S.C. section 1983. He also sought punitive damages.[4] The defendants moved for summary judgment on the basis of absolute immunity. The trial court granted partial summary judgment for the defendants, concluding that the defendants enjoyed absolute immunity for certain alleged tortious acts.[5] Only the false arrest, malicious prosecution, false imprisonment, and civil rights claims remained. The defendants filed a special action in this Court seeking review of the denial of summary judgment on the remaining claims and we declined jurisdiction.[6] The defendants filed a petition for review which the Arizona Supreme Court denied.

Subsequently, the City and County each moved for summary judgment on the grounds of qualified immunity from liability as to the section 1983 claims. The trial court denied the motions finding that qualified immunity applied to the case but concluding that qualified immunity was a jury issue, and that a reasonable juror could conclude that the acts or omissions of the defendants violated the plaintiff's constitutional rights.[7] This special action followed.

## QUALIFIED IMMUNITY

■ As a general rule, this Court reviews the evidence in support of summary judgment in a light most favorable to the non-moving party. *AROK Const. Co. v. Indian Const. Services,* 174 Ariz. 291, 293, 848 P.2d 870, 872 (App.1993). We will affirm the trial court's grant of summary judgment if there is no genuine issue of material fact in dispute, and the moving party is entitled to judgment as a matter of law. *Orme School v. Reeves,* 166 Ariz. 301, 305, 802 P.2d 1000, 1004 (1990). A motion for summary judgment based on qualified immunity is conceptually distinct from the merits of the case, and when the trial court has denied summary judgment for the defendant, we will affirm that denial only if under the defendant's version of the facts, the defendant's conduct violated a clearly established law. *Henke,* 161 Ariz. at 99, 775 P.2d at 1163 (citing *Mitchell,* 472 U.S. at 528, 105 S.Ct. at 2816). Our review is *de novo, Elder,* — U.S. at ——, 114 S.Ct. at 1023, and we make our own analysis of the facts derived from the documentary evidence provided. *Broemmer v. Abortion Services of Phoenix, Ltd.,* 173

---

4. Although the record before us does not include a copy of the complaint or the answers thereto, we are able to determine the essence of the plaintiff's complaint and the theories upon which he relies from the voluminous materials filed in this special action. *See Carroll v. Robinson,* 178 Ariz. 453, 458, 874 P.2d 1010, 1015 (App.1994) (to determine the capacity in which an individual is sued, court must examine pleadings and the course of the proceedings).

5. As to the City and the police defendants, the trial court concluded that absolute immunity applied only to the initial arrest and detention. According to the trial court, the dividing date was February 19, 1991, when victim C's property was discovered in Isaac's apartment. As to the County, the trial court concluded that it had absolute immunity for the initial charging decision and the initial detention. It found that the county may be liable for its investigative and administrative actions taken after February 19, 1991.

6. Judge Voss dissented and would have accepted jurisdiction and granted relief.

7. The trial court's minute entry of November 30, 1993 states that the defendants' motions for summary judgment were granted in part and denied in part. It is unclear, based on the context of the order and the motions themselves, to what extent the motions were granted. Therefore, we will treat the defendants' motions for summary judgment based on qualified immunity as having been denied.

Ariz. 148, 150, 840 P.2d 1013, 1015 (1992). With this standard of review in mind, we now consider the qualified immunity asserted by each of the defendants herein.

### A. City of Phoenix

#### 1. The Police Defendants

■ In the context of a qualified immunity defense to a section 1983 claim brought against individual tortfeasors, the plaintiff must meet a two part test. First, the plaintiff must prove that the individual defendants by their conduct violated one or more of the plaintiff's "clearly established" constitutional rights. This inquiry is the objective component. The plaintiff must then meet the subjective component by persuading the court that the individual defendants' conduct was so outrageous, malicious or incompetent that it would be uniformly rejected by a group of reasonably competent officials under similar circumstances. When the plaintiff meets both parts of this test, the qualified immunity protecting individual section 1983 defendants is no longer present and the case may proceed. We turn to the first prong of this inquiry.

■ The plaintiff must show, as a matter of law, that the defendants' conduct violated some constitutional or statutory right, and that such right was clearly established at the time of the alleged violation. *Siegert v. Gilley*, 500 U.S. 226, 231–34, 111 S.Ct. 1789, 1793–94, 114 L.Ed.2d 277 (1991) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982)). By the term "clearly established," it is meant that the unlawfulness of the defendants' conduct must be readily apparent to an objective reasonable official. *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987). It also means that the

plaintiff must define the exact factual parameters of the established right by staking out a "bright line" of case law, and if, in factual terms, the plaintiff has not staked out such a bright line, "qualified immunity almost always protects the defendant." *Post v. City of Fort Lauderdale*, 7 F.3d 1552, 1557 (1993), *modified*, 14 F.3d 583 (11th Cir.1994).[8] Finally, the plaintiff must show that the right allegedly violated was clearly established at the time of the incident. *Elder*, —— U.S. at ——, 114 S.Ct. at 1023 (citing *Davis v. Scherer*, 468 U.S. 183, 104 S.Ct. 3012, 82 L.Ed.2d 139 (1984)). Stated succinctly, the plaintiff must show that the right itself and its precise factual operation were so apparent at the time of the incident that a reasonably competent official would have had at least constructive notice of its existence.

■ In order to satisfy the subjective component, the plaintiff must come forth with facts that show that the defendant official *"knew or reasonably should have known* that the action he took within his sphere of official responsibility would violate the constitutional rights of the [plaintiff], *or* [that] he took the action *with the malicious intention* to cause a deprivation of constitutional rights or other injury. . . ." *Harlow*, 457 U.S. at 815, 102 S.Ct. at 2737 (emphasis in original) (citing *Wood v. Strickland*, 420 U.S. 308, 322, 95 S.Ct. 992, 1001, 43 L.Ed.2d 214 (1975)); *Golino*, 950 F.2d at 868 (factual or subjective inquiry to determine if "it would have been objectively reasonable for [the defendants] to believe that those actions did not violate [the plaintiff's] constitutional rights"). In short, qualified immunity " 'gives ample room for mistaken judgments' by protecting 'all but the plainly incompetent or those who knowingly violate the law,' " *Hunter*, 502 U.S. at 229, 112 S.Ct. at 537 (citing *Malley v. Briggs*, 475 U.S. 335, 341, 343, 106 S.Ct. 1092, 1096,

---

8. We reject plaintiff's contention that he be allowed to rely on the "contours of the right." Neither of the cases cited by the plaintiff stand for this proposition. In *Alexander v. Perrill*, 916 F.2d 1392 (9th Cir.1990), for example, the Ninth Circuit concluded that the defendants violated the plaintiff's rights, not because the plaintiff cited any specific court cases, but because the Bureau of Prisons had promulgated a regulation requiring the defendants to investigate the plaintiff's claims, which they did not do. Moreover,

*Navarro v. Barthel*, 952 F.2d 331 (9th Cir.1991), *cert. denied sub nom., McCleary v. Navarro*, —— U.S. ——, 112 S.Ct. 2324, 119 L.Ed.2d 243 (1992), never held that "abstract recognitions" of a right were sufficient to meet the burden of proving a constitutional claim; the violations in *Navarro* were clearly predicated on a prior fact specific case. *United States v. Collins*, 830 F.2d 145 (9th Cir.1987), *cited in Navarro*, 952 F.2d at 333.

1097, 89 L.Ed.2d 271 (1986)), and if officials of reasonable competence could disagree on a course of conduct, immunity should protect that conduct. *Malley*, 475 U.S. at 341, 106 S.Ct. at 1096. It is the trial court, not the jury, which must determine whether the facts of the case are sufficient to establish immunity. *Hunter*, 502 U.S. at 228, 112 S.Ct. at 537. Because this determination involves a question of law, we review the trial court's resolution *de novo*. *Elder*, —— U.S. at ——, 114 S.Ct. at 1023.

 The crux of plaintiff's claim against Detectives Edgcombe and Sechez is that after February 19, 1991, when the police discovered victim C's property in Isaac's apartment, the officers failed to "lobby" the County Attorney's Office vigorously enough to secure the plaintiff's release. The plaintiff apparently believes that because Lieutenant Thiele ultimately persuaded the County Attorney's Office to dismiss the charges, the individual police officers had the authority and duty to do the same and should have executed that duty sooner. We are not persuaded by this reasoning. After plaintiff's initial arrest and detention, and particularly after the grand jury indictment was returned on February 6, 1991, the police defendants in this case had absolutely no constitutional duty or authority to seek dismissal of the charges against the plaintiff or to effectuate his release from jail. *See State v. Williams*, 120 Ariz. 600, 603, 587 P.2d 1177, 1180 (1978) ("[I]t is not the function of the police to determine who will or will not be prosecuted. The decision to prosecute rests within the sound discretion of the County Prosecutor"). Beyond general references to due process flowing from disclosure of exculpatory material pursuant to *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), the plaintiff has not provided this Court with any fact specific legal authority from which we may determine that the police officers had an affirmative constitutional obligation to "lob-

by" the deputy county attorney on a suspect's behalf or achieve disclosure or dismissal for the suspect's benefit.[9] Thus, the plaintiff has failed to establish that the individual police officers were on notice that their conduct after February 19, 1991, was probably illegal.

In fact, the record before us reflects the contrary. The individual police officers promptly and fully disclosed the exculpatory evidence found in Warren Isaac's apartment to the deputy county attorney. This disclosure satisfied their obligation under the law, and they were under no obligation to supply this information directly to the plaintiff or his criminal trial attorney. *Walker v. City of New York*, 974 F.2d 293, 298–99 (2d Cir. 1992), *cert. denied*, —— U.S. ——, 113 S.Ct. 1387, 122 L.Ed.2d 762 (1993). *See also State v. Lajeunesse*, 27 Ariz.App. 363, 367, 555 P.2d 120, 124 (1976) ("If exculpating evidence comes to their [the police] attention during the investigation, *Brady* requires the prosecutor to furnish defense counsel with its substance. Beyond this *Brady* does not go") (brackets in original). In this context, the individual police officers did not violate the plaintiff's constitutional rights and section 1983 can provide no relief. We conclude that the plaintiff has not presented any constitutional violation stemming from the individual police officers' conduct after February 19, 1991, and has thus failed to meet the objective test for qualified immunity. Consequently, it is not necessary to address the reasonableness of the questioned conduct. *Siegert*, 500 U.S. at 231–32, 111 S.Ct. at 1793. Accordingly, we conclude that summary judgment on the basis of qualified immunity should have been granted with respect to the individual police defendants.

## 2. The City

 We next address the City's liability for the acts of the police officers. If a munic-

---

**9.** Plaintiff correctly argues that evidence may surface later which eliminates probable cause and thus requires favorable disposition to the suspect. *See Cox v. County of Suffolk*, 780 F.Supp. 103 (E.D.N.Y.1991). Assuming that the discovery of victim C's property in Isaac's apartment eviscerated probable cause to hold the plaintiff, that finding does not affect the liability of the police defendants, because, the indictment having been filed, the decision whether or not to act on this new evidence rested solely with the prosecutor. The plaintiff simply cannot link his continued incarceration after February 19, 1991, to the police defendants, who, at that time, had no authority or duty to act.

ipality's agents have inflicted no constitutional injury on the plaintiff, the municipality cannot be liable for any damages to the plaintiff. *City of Los Angeles v. Heller,* 475 U.S. 796, 799, 106 S.Ct. 1571, 1573, 89 L.Ed.2d 806 (1986). Because the individual police defendants here violated none of the plaintiff's constitutional rights and, as a matter of law, could not have been responsible for his continued incarceration, the City is likewise not responsible for a constitutional tort that never occurred. Therefore, the trial court erred when it denied the City's motion for summary judgment based on qualified immunity.

### B. Maricopa County

■ We surmise from the caption used before the superior court and this Court that plaintiff's section 1983 claim against the County does not name any of deputy county attorneys as individual defendants and must necessarily be based on a theory of vicarious liability. It is well settled that the County itself, as a municipal corporation, may not assert qualified or absolute immunity as a defense to a section 1983 claim. *Owen v. City of Independence,* 445 U.S. 622, 650, 100 S.Ct. 1398, 1451, 63 L.Ed.2d 673 (1980). Consequently, the deputy county attorneys' objective reasonableness in fulfilling their discretionary functions would not normally be material to our analysis. *Id.* at 649, 100 S.Ct. at 1414–15. Although the complaint is not part of the record before this Court, both the County and the plaintiff have briefed this issue here and below as if the individual deputy county attorneys were indeed individual parties to the case. We therefore feel compelled to address both aspects of liability, i.e., the liability of the individual deputy county attorneys and the liability of the County as a municipal entity. *See Carroll,* 178 Ariz. at 458, 874 P.2d at 1015. Because the defenses available to these parties vary according to their status, *Owen* 445 U.S. at 638 n. 18, 100 S.Ct. at 1409 n. 18, we separately address each below.

### 1. The Deputy County Attorneys

In the context of a claim against the individual deputy county attorneys, the County has asserted the applicability of the qualified immunity defense and argues that the conduct of the deputy county attorneys in this case was objectively reasonable. Because this case involves prosecutors, additional analysis is necessary since the type of prosecutorial immunity to be applied varies according to the functions of the prosecutor.

Bearing this consideration in mind, we must answer three questions. We first determine whether the deputy county attorneys' acts or omissions rise to constitutional dimensions. *Siegert,* 500 U.S. at 231–32, 111 S.Ct. at 1793. We next decide which acts of the deputy county attorneys are administrative and/or investigative and are therefore potentially entitled to qualified immunity. *Imbler v. Pachtman,* 424 U.S. 409, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976). Lastly, we examine whether the deputy county attorneys' conduct was, as a matter of law, objectively reasonable. *Harlow,* 457 U.S. at 816, 102 S.Ct. at 2737. For the reasons discussed below, we conclude that the trial court should have granted the County's second motion for partial summary judgment.

At the outset, we note that the plaintiff's section 1983 claim against the County, through its deputy county attorneys, centers around allegations that the deputy county attorneys responsible for the plaintiff's case violated his rights by (1) conducting a tainted lineup as opposed to releasing the plaintiff and dismissing the charges against him; (2) continuing the prosecution in light of the results of the lineup; and (3) failing to disclose the reports concerning the second sexual assault allegedly perpetrated by Warren Isaac to the plaintiff's criminal trial attorneys. We need not determine whether these alleged errors and omissions rise to constitutional dimensions, because the plaintiff has failed to meet the other necessary requirements to overcome the immunity defense.

■ We turn to the scope of immunity afforded to the acts and omissions of the deputy county attorneys in this case. Were the deputy county attorneys' actions quasi-judicial, or were they investigative or administrative? In this regard, the trial court concluded:

On this record, taken most favorably to Plaintiff, various actions of the Defendant County are "investigative" or "administrative" and not "judicial." The Defendant County is not liable, and has absolute immunity for, the initial charging decision and detention. The Defendant County may be liable for its "investigative" and "administrative" functions after February 19, 199[1].

The law affords criminal prosecutors two types of immunity which vary according to those duties they perform and the relationship between those duties and their role as a State's advocate. Prosecutors enjoy absolute immunity when they act in a quasi-judicial capacity. *Gobel v. Maricopa County,* 867 F.2d 1201, 1203 (9th Cir.1989). Quasi-judicial activities are those which are "intimately associated with the judicial phase of the criminal process." *Imbler,* 424 U.S. at 430, 96 S.Ct. at 995. These quasi-judicial activities include actions preliminary to the initiation of a prosecution, the professional evaluation of collected evidence, and the appropriate preparation of that evidence for its presentation at trial or before a grand jury. *Buckley v. Fitzsimmons,* —— U.S. ——, ——, 113 S.Ct. 2606, 2615, 125 L.Ed.2d 209 (1993).

■ Prosecutors are afforded only qualified immunity when they function as administrators, *Imbler,* 424 U.S. at 431 n. 33, 96 S.Ct. at 995 n. 33, *cited in Malley,* 475 U.S. at 342, 106 S.Ct. at 1096–97, or when they function as investigators. *Buckley,* —— U.S. at ——, 113 S.Ct. at 2617. Even after a determination of probable cause, the prosecutor may still engage in police-like investigative work which is entitled only to qualified immunity. *Id.* at —— n. 5, 113 S.Ct. at 2616 n. 5. *See Auriemma v. Montgomery,* 860 F.2d 273, 278 (7th Cir.1988), *cert. denied,* 492 U.S. 906, 109 S.Ct. 3215, 106 L.Ed.2d 565 (1989) (investigative activities by prosecuting attorney receive only qualified immunity "even though one may safely assume that government officials often expect that the fruits of any such investigation may ultimately end up in court"). The distinction between quasi-judicial activities and investigative or administrative activities is at times concededly difficult to discern. The outcome turns upon the availability of redress to the plaintiff through normal judicial channels for allegedly tortious actions which violate constitutional rights. Where the prosecutor's allegedly tortious actions may be rectified by objection, appeal, or post-verdict proceedings, the prosecutor may receive absolute immunity. *Marrero v. City of Hialeah,* 625 F.2d 499, 508–11 (5th Cir.1980), *cert. denied,* 450 U.S. 913, 101 S.Ct. 1353, 67 L.Ed.2d 337 (1981). However, when there are no "comparable self-remedying mechanisms ... outside the judicial phase of the criminal process, ... there is more compelling need for private actions to serve as a means of vindicating constitutional rights." *Id.* at 510. *See also Randle v. City and County of San Francisco,* 186 Cal.App.3d 449, 230 Cal.Rptr. 901, 910 (1986) (qualified immunity afforded to "conduct occurr[ing] outside the reach of any safeguard stemming from the judicial process"). Thus, while a prosecutor's alleged involvement in a courthouse beating and assault is clearly beyond the scope of an immediate judicial remedy, *see McDonald v. Doe,* 650 F.Supp. 858 (S.D.N.Y.1986), *aff'd,* 850 F.2d 121 (2d Cir.1988) (afforded only qualified immunity), an immediate judicial remedy does exist for a deputy county attorney's negligent or willful failure to disclose *Brady* materials. *See* Rule 15.1(a), Ariz.R.Crim.P., 17 A.R.S. (disclosure by State in matters relating to guilt, innocence or punishment); Rule 32.1(e), Ariz.R.Crim.P., 17 A.R.S. (post-conviction relief procedure available for newly discovered material facts). We first turn to the scope of immunity available for the deputy county attorneys' failure to disclose the Warren Isaac police reports to plaintiff's defense counsel.

■ There is evidence that as early as March 1, 1991, the plaintiff's criminal trial attorneys knew that the police suspected someone else in the victim C assault, yet it appears that neither one of them filed a motion to compel disclosure of the factual basis for that belief pursuant to Rule 15.1(a), Ariz.R.Crim.P. Had this case proceeded to trial without the disclosure of the reports, the plaintiff could have directly appealed or filed a petition for post-conviction relief pur-

suant to Rule 32.1(e), Ariz.R.Crim.P. Accordingly, we conclude that the deputy county attorney's failure to provide the Warren Isaac police reports to the plaintiff is protected by absolute immunity. This conclusion is consistent with holdings in other jurisdictions. *See, e.g., Saar v. United States Department of Justice,* 705 F.Supp. 999 (S.D.N.Y.1989) (Assistant United States Attorney absolutely immune for failure to provide defendant access to exculpatory documents, such actions taken while attorney serving as government's advocate and during judicial phase of criminal process); *Randle,* 230 Cal.Rptr. 901 (prosecutor absolutely immune for failure to provide police reports to the accused's attorneys regarding rape victim/witness' subsequent involvement in act of prostitution).

▪ We next turn to the deputy county attorney's decision to conduct a live lineup. We conclude that this act was merely another means of gathering and collecting evidence rather than an act of evaluating and marshaling previously collected evidence for trial. Through the execution of this lineup, the deputy county attorney obtained an incriminating visual in-person identification as well as a voice identification of the plaintiff to add to the prosecution. As if he himself were the investigator, the deputy county attorney's affirmative acts brought this new evidence into existence. He or she alone is responsible for it. *Buckley,* — U.S. at —, 113 S.Ct. at 2617. On the other hand, had the police unilaterally conducted this lineup and then forwarded the results to the deputy county attorney, the decision of how to incorporate those results into a criminal trial strategy would be protected by absolute immunity.

Therefore we must address the distinction between the actual conduct of the lineup and the decision of how to use its results. Had this case proceeded to trial, plaintiff's trial counsel could have filed a motion pursuant to *State v. Dessureault,* 104 Ariz. 380, 453 P.2d 951 (1969), *cert. denied,* 397 U.S. 965, 90 S.Ct. 1000, 25 L.Ed.2d 257 (1970), to suppress victim C's in-court identification of the plaintiff based on that lineup. It is clear, then, that an immediate judicial remedy existed as to use of the lineup identification as evidence, and that the resulting decision to continue the prosecution based on the results of the lineup is protected by absolute immunity.

The actual conduct of the lineup itself, however, and any prejudice flowing from it presents a different situation, because an immediate judicial remedy existed only for a decision to use the lineup in an anticipated trial, not for its actual occurrence. When we view the lineup as a discrete event, *cf. Auriemma,* 860 F.2d at 278–79, we conclude that the plaintiff would not have an immediate judicial remedy available without filing a separate lawsuit to obtain redress for any harm emanating from the lineup. Thus, the actual decision to conduct the lineup is protected only by a qualified immunity. This conclusion is consistent with our analysis above that the decision to conduct the lineup is an investigative act. Accordingly, we conclude that the deputy county attorneys are absolutely immune for their failure to disclose the exculpatory evidence to the plaintiff's criminal trial counsel and are likewise absolutely immune for their decision to continue pressing the case against the plaintiff based on the results of the lineup. Their decision to actually conduct the lineup, however, is protected by qualified immunity.

We turn now to the third and final question previously posed, and conclude that summary judgment would still be appropriate because we cannot conclude, as a matter of law, that the deputy county attorneys' conduct was objectively unreasonable. If we find that a reasonably competent deputy county attorney could—but not necessarily would or must—conclude that his or her actions were legal and proper, the deputy county attorneys' conduct is protected with the shield of qualified immunity. *Malley,* 475 U.S. at 341, 106 S.Ct. at 1096; *Harlow,* 457 U.S. at 816, 102 S.Ct. at 2737.

▪ We cannot conclude as a matter of law that the decision to conduct a live lineup, as opposed to immediately releasing the plaintiff and dismissing the charges, was so egregious as to be uniformly condemned by a group of reasonably competent deputy county attorneys. Victim C's unequivocal identi-

fication of the plaintiff from a photographic collection would certainly support a decision to seek an indictment against the alleged assailant. Moreover, the fact that a man matching the plaintiff's description was seen in a nearby apartment complex "stalking" women, that burglaries occurred immediately after sightings of that man, and that the plaintiff was a former tenant of that complex, while highly circumstantial, is sufficient to support a belief that the plaintiff was possibly the perpetrator. Moreover, victim C's identification of the plaintiff at the live lineup further supports this belief. We conclude, therefore, that the deputy county attorneys' decision to conduct a live lineup was objectively reasonable and they are entitled to the protections of qualified immunity.

## 2. The County

■ We next turn to the plaintiff's claims against the County in its status as a municipal government corporation. With respect to this status, 42 U.S.C. section 1983 originally imposed liability only on "persons," and the earlier cases turned upon whether local governments could be liable, or were wholly immune because of their "impersonal status." *See Monroe v. Pape*, 365 U.S. 167, 191, 81 S.Ct. 473, 486, 5 L.Ed.2d 492 (1961) (local governments were not persons to whom section 1983 applies and thus absolutely immune). In 1978, however, the Supreme Court concluded that

> [l]ocal governing bodies ... can be sued directly under § 1983 for monetary, declaratory, or injunctive relief where ... the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers. ... [L]ocal governments, like every other § 1983 "person," ... may be sued for constitutional deprivations visited pursuant to governmental "custom" even though such a custom has not received formal approval through the body's official decisionmaking channels.

*Monell v. Department of Social Services of the City of New York*, 436 U.S. 658, 690–91,

98 S.Ct. 2018, 2019, 56 L.Ed.2d 611 (1978) (footnotes omitted). A municipality [10] shall not be vicariously liable merely because it employs a tortfeasor, but it may be liable if a plaintiff shows that the municipality's conduct is sufficient to give rise to a constitutional violation. Municipal liability arises, however, only "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury." *Id.* at 694, 98 S.Ct. at 2037. In short, municipal liability arises only when the municipality itself can be directly charged with fault. *Spell v. McDaniel*, 824 F.2d 1380, 1386–87 (4th Cir.1987), *cert. denied*, 484 U.S. 1027, 108 S.Ct. 752, 98 L.Ed.2d 765 (1988). We must first determine the theory upon which plaintiff relies to directly hold the County at fault. This necessitates a consideration and brief discussion of the theories available.

■ Our review of the relevant case law suggests four theories of vicarious liability against a municipality in a 42 U.S.C. section 1983 claim: (1) the tortious conduct arose directly from a policy maker's *ad hoc* order or directive and that the policy maker had the final decision making authority within the governmental power structure, *see City of St. Louis v. Praprotnik*, 485 U.S. 112, 123, 108 S.Ct. 915, 924, 99 L.Ed.2d 107 (1988); *Pembaur v. City of Cincinnati*, 475 U.S. 469, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986); (2) the allegedly tortious conduct flows from an express policy or rule that is so facially unconstitutional that one application of it is sufficient to impose liability, *see Monell*, 436 U.S. at 690, 98 S.Ct. at 2035–36; (3) if a policy is of uncertain origin, or is not itself unconstitutional, the existence of the policy or custom must be proven by more than evidence of a single incident, and a causal connection between the policy or custom and the deprivation of constitutional rights must be established, *see City of Oklahoma City v. Tuttle*, 471 U.S. 808, 824, 105 S.Ct. 2427, 2436, 85 L.Ed.2d 791 (1985); and (4) the municipality has failed to train or supervise its employees, *see, e.g., City of Canton v. Harris*, 489 U.S.

---

**10.** By "municipality," we refer to the County. Had we not disposed of the City's liability on other grounds, this analysis would be equally applicable to the City as well.

378, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989); *Walker v. City of New York*, 974 F.2d 293 (2d Cir.1992). *See generally Spell*, 824 F.2d 1380. In the present case we eliminate consideration of the last two of these alternatives because the plaintiff has failed to provide the necessary evidence of prior incidents of similar conduct that have occurred in the past.[11] The second theory likewise does not apply because the plaintiff has provided no evidence of an express *Monell*-type policy or directive to conduct identification lineups in similar situations.

We are therefore left to apply the *Pembaur* analysis and determine whether a deputy county attorney is a decision maker with final authority in the municipal power structure. This is a question of state law. *Praprotnik*, 485 U.S. at 123, 108 S.Ct. at 924. A County Attorney may be a "policy maker" within the meaning of a section 1983 suit, and any deliberate indifference by that officer to the plaintiff's constitutional rights may render the municipality liable under section 1983. *Walker*, 974 F.2d at 301; *Gobel*, 867 F.2d at 1207–08. The deputy county attorneys are subordinates of the County Attorney; their deviations from any policies or rules attributable to the County Attorney are not the acts of the County. It is the adoption of policies themselves, not the deviations from them, for which the County may be liable. *Praprotnik*, 485 U.S. at 127, 108 S.Ct. at 926. Accordingly, a deputy county attorney's individual exercises of judgment of when and how to pursue his case do not reflect municipal policies unless they are expressly ratified and approved by the policy maker with final authority, which, in this case, would be the County Attorney. *Id. See also Feerick v. Sudolnik*, 816 F.Supp. 879, 886 (S.D.N.Y.1993), *aff'd*, 2 F.3d 403 (2d Cir.1993) (assistant's decision to seek indictment and proceed with grand jury presentation in particular matter were discretionary exercises of authority and did not reflect municipal policy).

The deputy county attorneys' decision to conduct a live lineup and their failure

to disclose the Warren Isaac police reports are simply the individual exercise of individual judgment and discretion by a subordinate county official. The assertion that this deputy county attorney is a subordinate official is further supported by his statement in an internal memo that he sought advice and clearance from others to determine whether or not to dismiss the charges against the plaintiff after he spoke with Lieutenant Thiele. The plaintiff has failed to link the decision to conduct the lineup directly to the County Attorney himself, however, and the plaintiff has not shown that the County Attorney knew of and ratified the conduct occurring after February 19, 1991. *Compare Pembaur*, 475 U.S. at 481–84, 106 S.Ct. at 1299–1301 (municipal liability established where City Prosecutor instructed assistant to instruct sheriff deputies to break down plaintiff's door in executing search warrant). We therefore conclude that the County itself is not liable for any harm with respect to the live lineup. We likewise conclude that the deputy county attorneys' failure to disclose the police reports concerning Warren Issac's involvement in the case has not been similarly linked to the municipal power structure.

The plaintiff nevertheless argues that the qualified immunity defense is not available to the County and relies on *Owen*, 445 U.S. at 638, 100 S.Ct. at 1409 (a municipality may not assert the good faith of its employees as a defense). While this is a correct statement of the law, this reliance on *Owen* is misplaced in the context of the present case. The plaintiff must, at the outset, link the act or omission of the County to a policy maker with final decision making authority. In *Owen*, the plaintiff had already satisfied that requirement by linking his wrongful termination to an order emanating directly from the Independence City Council. We believe a fairer reading of *Owen*, then, is that the municipality may not assert the good faith of its employees as a defense under the guise of qualified immunity when qualified immunity would not otherwise be available.

---

11. A policy or custom is shown with proof of conduct that is found in "persistent and widespread ... practices of [municipal] officials [which] ... [a]lthough not authorized by written law, [are] *so permanent and well-settled as to*

[have] the force of law." *Monell*, 436 U.S. at 691, 98 S.Ct. at 2036 (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 167–68, 90 S.Ct. 1598, 1613–14, 26 L.Ed.2d 142 (1970)).

Had the plaintiff in this case satisfied the threshold burden of *Monell* and *Pembaur*, this argument might have merit. As it is, the question of the existence of good faith on the part of the County employees is immaterial to this analysis.

It is the conclusion of this Court that the plaintiff's vicarious claims against both the County and the deputy county attorneys must fail for a number of reasons. The deputy county attorneys' failure to disclose the *Brady* materials and decision to continue the case to trial on the basis of the live lineup identification are protected by absolute immunity. The deputy county attorneys are also qualifiedly immune for their decision to conduct the live lineup because the plaintiff has not shown that the deputy county attorneys' conduct under the facts of this case was objectively unreasonable. As to the County itself, the plaintiff failed to link any of the foregoing conduct to a policy maker with final decision making authority as required by *Monell*. Accordingly, the trial court should have entered summary judgment for the County on the plaintiff's 42 U.S.C. section 1983 claims.

### CONCLUSION

In light of the preceding analysis, the claims against the individual police defendants and the City must be dismissed for want of a violation of a clearly established constitutional right. We also conclude that in the context of this case the deputy county attorneys are entitled as a matter of law to either qualified or absolute immunity for their decisions with respect to the plaintiff that were made after February 19, 1991. The County itself is entitled to summary judgment because the plaintiff has failed to prove it responsible for his harms. Accordingly, the trial court is directed to grant summary judgment in favor of all defendants on the 42 U.S.C. section 1983 claims. The stay we initially imposed is hereby vacated. This case is remanded for proceedings consistent with this opinion.

WEISBERG, P.J., and TOCI, J., concur.